IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Lizzie Davenport,     )
          ) Civil Action No. 6:04-23181-DCN-WMC
     Plaintiff, )
          ) **REPORT OF MAGISTRATE JUDGE**
  vs.      )
          )
Jo Anne B. Barnhart,    )
Commissioner of Social Security, )
          )
     Defendant. )
_____)

  This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

  The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. Sections 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").

### ADMINISTRATIVE PROCEEDINGS

  On August 10, 2000, the plaintiff filed applications for DIB and SSI alleging disability beginning July 20, 2000. The applications were denied initially and on reconsideration. The plaintiff timely requested a hearing, which was held on December 10,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

2001. The ALJ denied the plaintiff's claims, finding she could perform unskilled sedentary work (Tr. 15-22). The Appeals Council denied the plaintiff's subsequent request for review, making the ALJ's decision of January 17, 2002, the Commissioner's final decision. Thereafter, the plaintiff commenced an action for judicial review. On October 15, 2002, based on the Commissioner's unopposed Motion for Entry of Judgment with Remand Pursuant to Sentence Four of 42 U.S.C. § 405(g), the district court remanded the case to the Commissioner for further proceedings (Tr. 258-73). The ALJ was instructed to evaluate the opinions of the plaintiff's treating physicians, evaluate the plaintiff's residual functional capacity and the plaintiff's subjective complains, obtain supplemental evidence from a vocational expert concerning the effects of the plaintiff's limitations on the occupational base, and hold a supplemental hearing and issue a new decision (Tr. 255-57).

A supplemental hearing was held on April 9, 2003, at which the plaintiff and Dr. William Stewart, a vocational expert, testified (Tr. 215-39). On July 15, 2003, the ALJ issued a decision again denying the plaintiff's claims, finding she could perform a limited range of sedentary work (Tr. 207-13). This determination became the final decision of the Commissioner when the Appeals Council denied the plaintiff's request for review. On December 6, 2004, the plaintiff filed her complaint seeking judicial review.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)   The claimant's multiple sclerosis and borderline intellectual functioning are severe impairments, based upon the requirements in the Regulations 20 CFR §§ 404.1521 and 416.921.

2

(4)     This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

(6)     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

(7)     The claimant has the following residual functional capacity: lifting and carrying 10 pounds, simple, routine unskilled work with no interaction with the public or co-workers; limited climbing; no repetitive fine dexterity or gripping; avoidance of hazards; an environment free from sunlight.

(8)     The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

(9)     The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

(10)    The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

(11)    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

(12)    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 416.967).

(13)    Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as a security monitor, with 2,000 such jobs in the state economy, and inspector/examiner, with 1,000 such jobs in the state economy.

(14)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

3

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie

4

showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

5

**EVIDENCE PRESENTED**

The plaintiff was born August 18, 1965, and she was 37 years old as of the date of the supplemental hearing(Tr. 55). She has a high school education and has worked as a sewing-machine operator, ham cutter, and turkey cutter (Tr. 72, 227).

On April 17, 2000, the plaintiff was admitted to Palmetto Richland Memorial Hospital with complaints of left-sided numbness and severe headaches. Examination revealed normal muscle bulk and tone, full strength in all extremities, normal reflexes, normal heart rate and rhythm, intact concentration and memory, normal speech, and decreased sensation over the left face, arm and leg. An MRI of the brain showed "bilateral MS-like plaques all over." The plaintiff responded well to medication and by April 21, 2000, her date of discharge, her numbness had been "totally abolished." Dr. Nasir Waheed rendered a diagnosis of probable multiple sclerosis ("MS") (Tr. 115-24).

On April 26, 2000, the plaintiff complained to Dr. Waheed of headaches with nausea and photophobia. Dr. Waheed found the plaintiff had normal speech, strength, and sensation. He prescribed Elavil and noted an impression of migraine headaches and probable MS (Tr. 131).

On May 4, 2000, the plaintiff complained to Dr. Thomas F. Bradberry of episodes of weakness of the legs and poor sensation in the distal extremities. Physical examination revealed full muscle strength in all fields and normal sensation (Tr. 139).

On May 10, 2000, the plaintiff complained to Dr. Waheed of "diffuse itches and pin pricks" over the extremities. Dr. Waheed noted that the plaintiff's headaches were much improved with Elavil without side effects, and that her numbness had abated. Examination revealed normal speech, strength, sensation, coordination and gait (Tr. 130).

On May 18, 2000, the plaintiff reported improvement in her symptoms to Dr. Bradberry. She stated that she continued to work but became extremely tired after 4-5 hours of work (Tr. 138).

6

On June 29, 2000, the plaintiff complained to Dr. Bradberry of severe fatigue and enhanced symptoms after a full day of work. Dr. Bradberry found the plaintiff had excellent grip strength bilaterally and no sensory deficits in the extremities (Tr. 138).

On July 21, 2000, the plaintiff reported to Dr. Bradberry that she had recently fallen on two occasions and that she was working when she could. Dr. Bradberry noted "the issue here is a person who has an excellent work record and now is being limited by her disease." Physical examination revealed symmetrical reflexes and equal strength in the upper and lower extremities (Tr. 136).

On August 3, 2000, the plaintiff complained to Dr. Waheed of two episodes of dizziness in the previous two weeks, during one of which she had "passed out transiently." Dr. Waheed determined her episodes were secondary to migraine headaches and adjusted her medication (Tr. 129).

On August 18, 2000, the plaintiff complained to Dr. Bradberry of leg pain, increased dizziness, and worsening memory. Dr. Bradberry continued her medications (Tr. 135).

On August 28, 2000, the plaintiff complained to Dr. Waheed of swelling in the right hand, difficulty with coordination in the right arm and leg, and numbness on the right side. Dr. Waheed found the plaintiff had decreased sensation in the left arm and leg, slightly decreased strength in the right shoulder, arm, wrist, hip, and ankle, and brisker reflexes on the right. He also found that her gait was steady but that she was unable to walk on her heels. Dr. Waheed noted an impression of probable exacerbation of MS and migraine headaches (Tr. 128).

On September 6, 2000, Dr. Waheed found the plaintiff had reduced strength on the right and "slightly sluggish" coordination in the right extremities. He noted that an MRI study of her brain showed a new lesion in the right frontal lobe and rendered an impression of MS and migraine headaches. Dr. Waheed commented that the plaintiff still

had "significant weakness and some coordination problem with the right arm and I personally don't think she is ready to go back to work yet" (Tr. 127).

On September 15, 2000, the plaintiff complained of swelling and pain in the right forearm and pain in the leg. She reported that she was dropping things and was unable to work. Dr. Bradberry prescribed pain medication and noted an impression of MS with ongoing pain and flare with "[n]o evidence of progression per recent MRI" (Tr. 135).

On September 21, 2000, Dr. Edward C. Haile, Jr., assessed the plaintiff's physical residual functional capacity at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Haile concluded that the plaintiff could perform medium work which did not require climbing or exposure to hazards (Tr. 172-79).

On October 13, 2000, the plaintiff complained to Dr. Bradberry of increased pain and more frequent dropping of objects. Dr. Bradberry noted a diagnosis of MS with ongoing pain and hypertension (Tr. 134).

On November 10, 2000, Dr. Bradberry noted that the plaintiff was "out of work due to motor dysfunction, as well as some psychological issues (slowing in mental function, misspelling of words and some resulting depression)." Dr. Bradberry also stated that her MS was "not perceptively worsening at present" (Tr. 134).

On January 8, 2001, the plaintiff reported improvement with regard to weakness and migraine headaches but complained of diffuse pain in the lower back and knees. Dr. Waheed found she had slightly reduced (5-/5) strength in the right deltoids, triceps and hip, and no other neurological abnormalities (Tr. 126).

On January 12, 2001, the plaintiff reported improvement in her low back pain and depression to Dr. Bradberry. Examination revealed mild right-sided weakness and reasonably good ambulation. Dr. Bradberry noted that the plaintiff's MS was accompanied by "marked mental slowing with regard to quantification, vocabulary and speed of thought" and that her MS would "hopefully" be "mild" (Tr. 133).

On April 6, 2001, the plaintiff complained to Dr. Waheed of more frequent headaches and numbness of the left lower leg. Dr. Waheed found she had decreased sensation over the left leg and right arm, normal strength, normal reflexes, and normal coordination and gait (Tr. 125).

On April 19 and 24, 2001, Dr. Bradberry treated the plaintiff for menorrhagia and allergic rhinitis (Tr. 132).

On May 3, 2001, Dr. Robert E. Brabham examined the plaintiff at the request of the Commissioner. The plaintiff related that she graduated from high school without difficulty and without special education classes. She reported an inability to do many routine chores due to shortness of breath, frequent dizzy spells, general fatigue and malaise. She also reported memory lapses, edema, and side effects of medication that included extreme grogginess and difficulty with vision. Dr. Brabham reported the plaintiff had a full scale I.Q. of 72 and diagnoses of depressive disorder, borderline intellectual functioning, and MS. He stated that she appeared to have "major limitations" in her ability to perform work-related functions due to deficits in reasoning and "limitations that manifest themselves with regard to her not making appropriate occupational and social adjustments due to the combination of conditions." He also found her "quite credible" (Tr. 140-43).

On May 22, 2001, Dr. Eloise A. Bradham assessed the plaintiff's physical residual functional capacity at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Bradham concluded that the plaintiff could perform sedentary work, subject to postural limitations (Tr. 163-70).

On May 23, 2001, Dr. Lisa Smith Klohn completed a Psychiatric Review Technique Form at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Klohn concluded that the plaintiff had "moderate" limitations in activities of daily living, social functioning, and concentration/persistence/pace, and that she experienced no episodes of decompensation (Tr. 145-57). In an accompanying mental

9

residual functional capacity assessment, Dr. Klohn reported that the plaintiff had no significant limitations in most areas of work-related mental functioning and "moderate" limitations in the following areas:  understanding, remembering and carrying out detailed instructions; maintaining concentration for extended periods; performing activities within a schedule; interacting appropriately with the general public; and completing a normal workday/workweek without interruption from psychologically based symptoms.  Dr. Klohn explained that the plaintiff could perform simple tasks without special supervision, attend work regularly, accept supervision, make work-related decisions, and protect herself from hazards.  She also stated that the plaintiff "may not be suited for the stress of working with the general public" (Tr. 159-61).

On July 11, 2001, the plaintiff complained to Dr. Waheed of episodic blurring of vision, weakness, paresthesias and headaches.  Examination revealed normal speech, full strength, normal gait and coordination, and symmetrical reflexes (Tr. 182).

On August 14, 2001, Dr. Bradberry found that the plaintiff had normal reflexes and sensation and reduced grip strength on the left.  He also stated that she was "disabled" (Tr. 183).

On September 12, 2001, Dr. Bradberry treated the plaintiff for allergic rhinitis and noted that her MS appeared to be "under reasonable control" with Interferon injections (Tr. 183).

On October 9, 2001, Dr. Bradberry treated the plaintiff for sinusitis and noted she had a "questionable swallowing dysmotility" symptom related to MS (Tr. 303).

At the hearing on December 10, 2001, the plaintiff testified that she stopped working because of poor vision, numbness and weakness of the body, and migraine headaches (Tr. 31).  She stated that her medication made her drowsy and that she was restricted from driving because of her tendency to pass out (Tr. 34).  She testified that her problems included numbness, pain, lightheadedness, loss of balance, difficulty with walking,

10

and reduced grip strength (Tr. 35-36). She also testified that she experienced swelling of the hands which prevented her from doing "just about anything" (Tr. 44).

On February 6, 2002, the plaintiff complained to Dr. Waheed of having one to two headaches per month accompanied by nausea and photophobia and preceded by passing-out spells. Examination revealed full strength, normal gait and coordination, symmetrical reflexes, and decreased sensation over the left arm and leg. Dr. Waheed noted an impression of MS in remission and complicated migraine headache (Tr. 298).

On February 15, 2002, Dr. Bradberry found the plaintiff's blood pressure was elevated and increased her dosage of antihypertensive medication. Dr. Bradberry noted that the plaintiff had been noncompliant with medication due to lack of funds (Tr. 302).

On March 22, 2002, the plaintiff complained to Dr. Bradberry of unremitting headache pain and of a seizure witnessed by her son. Dr. Bradberry ordered laboratory studies and an MRI scan (Tr. 301).

On April 8, 2002, Dr. Waheed noted that the plaintiff had been on Dilantin after having a tonic/clonic seizure that had lasted a few seconds. Examination findings consisted of decreased sensation over the left arm (5-/5) and left leg (4+/5) (Tr. 297).

On May 23, 2002, the plaintiff complained of increased fatigue, occasional stiffness in the legs, and generalized tonic/clonic seizures accompanied by "jerking activity." Dr. Waheed found the plaintiff had normal muscle tone and strength, normal coordination and gait, and decreased sensation over the left arm and leg. He noted that the plaintiff's EEG study was normal and that an MRI scan of her brain showed multiple frontal lobe lesions that were "nonenhancing." Dr. Waheed noted a diagnosis of probable MS, migraine headaches, and isolated witnessed generalized tonic/clonic seizures (Tr. 296).

On June 7, 2002, Dr. Bradberry treated the plaintiff for cold symptoms and prescribed Lortab for severe pain (Tr. 301).

11

On July 18, 2002, the plaintiff complained to Dr. Waheed of intermittent right-leg discomfort and fatigue. Dr. Waheed noted that all of the plaintiff's symptoms were currently under control (Tr. 295).

On September 11, 2002, the plaintiff reported improvement in her headaches and continued left-sided weakness and numbness. Dr. Waheed found she had normal speech and language, normal cognitive and memory function, normal cranial nerves, normal muscle tone and strength, normal coordination and gait, and decreased vibratory sensation in the left arm and leg (Tr. 294).

On October 2, 2002, the plaintiff complained to Dr. Bradberry of constant leg pain and numbness, and reported that she had started walking with a cane. Dr. Bradberry noted an impression of progression of MS with ebb and flow of progressive and relapsing symptoms (Tr. 300).

On November 22, 2002, the plaintiff complained to Dr. Waheed of constant fatigue, poor memory, spells of generalized shakiness, and increased left-sided numbness. Dr. Waheed found she had full ("5/5") strength in the arms and right leg, slightly reduced ("5-/5") strength in the left leg, decreased sensation in the left extremities, and normal fine motor functioning. He also noted that she walked with a cane (Tr. 293).

On February 7, 2003, Dr. Bradberry treated the plaintiff for sinusitis and noted complaints of increased numbness in the legs and deterioration in memory. Dr. Bradberry noted an impression of MS with progression of symptomatology and stated that he "wholeheartedly" supported her application for disability benefits (Tr. 299).

On March 12, 2003, the plaintiff reported decreased fatigue to Dr. Waheed but complained of poor memory and increased left-sided weakness. Dr. Waheed found the plaintiff had good speech and language, normal bilateral dexterity, borderline immediate recall, decreased reflexes, decreased sensation of the left, and slightly-reduced ("5-/5") strength on the left. He also noted that the plaintiff was walking with a cane (Tr. 308).

12

In a letter to the plaintiff's attorney dated March 27, 2003, Dr. Bradberry stated that the plaintiff had had "relapsing and remitting" episodes characteristic of MS and was "unable to work and support her only child" (Tr. 292).

On April 3, 2003, in a Residual Functional Capacity Assessment form, Dr. Bradberry stated that the plaintiff had relapsing/remitting episodes of MS manifested by pain and weakness, that her symptoms had worsened, and that she was "very deserving of disability" (Tr. 304-06).

At the hearing of April 9, 2003, the plaintiff testified that she received weekly injections for MS, that she had been using a cane which had been prescribed by a doctor for about three months, and that she experienced severe pain in her arms, legs, hands, and jaw and left-sided numbness (Tr. 218-20, 225-26).  She testified that she experienced swelling and weakness in her hands which caused her to drop things constantly (Tr. 220-21).  She testified that she could walk or stand for approximately five minutes (Tr. 222). She testified that she did some sweeping but no cooking or shopping by herself, and that her physician had restricted from driving due to seizures (Tr. 223).  She testified that she had problems concentrating, could not stay on a task for two hours, and did not understand what she read (Tr. 222-24).

The ALJ asked Dr. William Stewart, a vocational expert, whether jobs existed which the plaintiff could perform, assuming she had the ability to perform sedentary work with the following restrictions:  limited to simple one- and two-step instructions; no interaction with the general public; no climbing, working at heights, or working around dangerous machinery; no exposure to dust, fumes, noxious odors, chemicals, high humidity, or sunlight; and no rapid or repetitive finger dexterity (Tr. 227-28).  Dr. Stewart testified that such an individual could work as a security monitor and an inspector/examiner (Tr. 228).

13

## ANALYSIS

The plaintiff alleges disability commencing July 20, 2000, as a result of MS. She alleges that the ALJ erred (1) in relying on a hypothetical question to the vocational expert that was not as restrictive as the ALJ's own RFC findings; (2) in failing to find the plaintiff disabled pursuant to SSR 96-9p; 3) in failing to comply with SSR 00-4p; (4) in failing to properly evaluate the opinions of the plaintiff's treating physicians; (5) in failing to find the claimant meets the MS Listing; and (6) in failing to properly evaluate the plaintiff's pain. This court agrees.

### *Hypothetical Question and SSR 96-9p*

The ALJ found that the plaintiff had the following RFC:

> ... lifting and carrying 10 pounds; simple, routine, unskilled work with no interaction with the public or co-workers; limited climbing; no repetitive fine dexterity or gripping; avoidance of hazards; and environment free from sunlight.

(Tr. 212). However, the ALJ did not include the limitations of "no interaction with co-workers" and "no repetitive . . . gripping" in his hypothetical to the vocational expert (Tr. 227-28). The Fourth Circuit Court of Appeals has held that reversible error occurs if the hypothetical to the vocational expert is inconsistent with the claimant's impairments. *Riley v. Chater*, No. 94-1797, 1995 WL 361483, *3 (4th Cir. 1995) ("The VE's testimony, which was based on hypothetical questions that did not encompass all relevant impairments, does not constitute substantial evidence to support the ALJ's decision."). The defendant argues that the ALJ's findings of fact cannot be relied on because "[t]he evidence simply fails to support a finding that Plaintiff was unable to tolerate contact with co-workers" (def. brief at 19). As argued by the plaintiff, the defendant is arguing in essence that it does not matter that the ALJ failed to ask the proper hypothetical, because the ALJ would been wrong anyway (pl. reply at 3-4). Such post-hoc rationalizations are prohibited. *See Golembiewski*

14

*v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003).   The plaintiff further argues that the inconsistency between the hypothetical to the vocational expert and the ALJ's RFC finding is further prejudicial because Social Security Ruling 96-9p states: "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity."  SSR 96-9p, 1996 WL 374185, *8.  Based upon the foregoing, this court finds that the ALJ was in error.

### SSR 00-4p

Upon remand, the ALJ was directed to "identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles" ("DOT") . . .  (Tr. 256) (citing SSR 00-4p[2]).  In the supplemental hearing, the vocational expert identified the jobs of security monitor and inspector/examiner as jobs that a person with the RFC and limitations identified by the ALJ could perform.  The ALJ asked the vocational expert the following question in this regard: "Are the exertional levels in these jobs consistent with those that are described in the DOT?," and the vocational expert responded affirmatively (Tr. 228).  The plaintiff's attorney questioned the vocational expert at the hearing as follows:

> [T]he DOT does not state that the . . . two occupations that you identified could be performed with the additional limitations

---

[2]Social Security Ruling 00-4p provides in pertinent part:

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

identified by the ALJ [no general public, no dangerous machinery, no environmental exposure, and no rapid, repetitive finger dexterity] over and beyond the sedentary RFC?"

(Tr. 230).

The vocational expert acknowledged that the limitations were not used in the DOT's description, but noted that the DOT would only include the maximum requirements of occupations as generally performed rather than identifying the specific restrictions given by the ALJ (Tr. 230-31).  The ALJ included the limitation of "simple one and two step instructions" in his hypothetical to the vocational expert (Tr. 227).  The vocational expert testified that the there were approximately 2,000 security monitor jobs and 1,000 inspector/examiner jobs that would fit the hypothetical (Tr. 228).  However, upon examination by the plaintiff's attorney, the vocational expert testified that the DOT provides that the reasoning level for the surveillance system monitor occupation is higher than that set out in the hypothetical (Tr. 235-36).  This court agrees that, pursuant to SSR 00-4p, the ALJ was obliged to inquire, discuss, and fully resolve these apparent conflicts between the vocational expert evidence and information provided in the DOT.

### Treating Physician

The plaintiff argues that the ALJ did not properly evaluate the opinions of her treating physician.  The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §416.927(d)(2) (2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce

16

conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The ALJ stated the following with regard to the plaintiff's treating physicians: "I am aware of the opinions of these physicians that the claimant is disabled but such opinions are reserved to the Commissioner and they are not supported by the objective evidence" (Tr. 209). The ALJ does not state what weight, if any, was given to the opinions of the plaintiff's treating physician.

Treating physician Dr. Thomas Bradberry, a board-certified internal medicine specialist, noted on October 13, 2000, that the plaintiff was applying for disability, which he supported (Tr. 134). On November 10, 2000, Dr. Bradberry stated that the plaintiff had multiple sclerosis and that she was out of work due to motor dysfunction and psychological issues, including slowing in mental function, misspelling of words, and resulting depression (Tr. 134). On June 7, 2002, he stated, "Prescription for Lortab is given because she has pretty severe pain. She has Multiple Sclerosis and is on new medications for seizures" (Tr. 301). On October 2, 2002, Dr. Bradberry further stated:

> Her Multiple Sclerosis appears to have progressed. In her neurology report in May of this year, there were multiple frontal lobe lesions. She is on weekly Beta-Interferon injections and Topamax has been increased to 200 mg. BID. She reports constant leg pain as well as numbness requiring the use of a walking cane . . . . Progression of patient's Multiple Sclerosis with ebb and flow of progressive and relapsing symptoms.

(Tr. 300). On February 7, 2003, Dr. Bradberry noted: "Multiple Sclerosis with progression of symptomatology. She is applying for disability and I wholeheartedly support her application" (Tr. 299).

On March 27, 2003, Dr. Bradberry wrote:

> I treated her prior to her diagnosis of Multiple Sclerosis. She is afflicted with an unfortunate disease, which has been verified

17

by magnetic resonance imaging studies of her brain. She is currently on weekly injections with medications to fight this severe autoimmune disease of her nervous system. She is unable to work and support her only child. Unfortunately, advances in curing this disease are slow in coming. She has relapsing and remitting episodes, which are characteristic of Multiple Sclerosis. Once again, I strongly support her application for disability.

(Tr. 292).

On April 3, 2003, Dr. Bradberry filled out an RFC form, stating that the plaintiff cannot lift any weight for two hours per eight-hour day, and that she cannot lift even 10 pounds at anytime. He stated: "This patient has relapsing/remitting episodes of Multiple Sclerosis which are manifested by pain and muscular weakness. Symptoms have worsened and she is very deserving of disability" (Tr. 305).

Treating physician Dr. Nasir Waheed, a board-certified neurologist, stated on September 6, 2000, that the plaintiff had "significant weakness and some coordination problems with the right arm and I personally don't think she is ready to go back to work yet" (Tr. 127). From 2000 to 2003, Dr. Waheed has noted "weakness and parasthesias," migraines, and decreased pinprick on the left arm and leg (Tr. 182). He has also noted worsening headaches, including passing out spells (Tr. 298), seizures and weakness (Tr. 295-97), significant fatigue and decreased sensation in the left arm and leg (Tr. 294), worsening of left-sided numbness, poor memory, and fatigue (Tr. 293, 308), and the plaintiff's need of a cane (Tr. 308).

The ALJ admits that the plaintiff "has a condition that waxes and wanes" (Tr. 210). The Fourth Circuit Court of Appeals has stated the following regarding intermittent incapacity: "The ALJ must consider this question and make specific findings on whether [the claimant's] intermittent incapacity constitutes an inability to perform any substantial gainful activity." *Totten v. Califano*, 624 F.2d 10, (4th Cir. 1980). However, as noted by the plaintiff, the ALJ in considering the treating physicians' opinions simply "went on to look for

18

isolated instances in previous records wherein the Claimant's symptoms were waning" (pl. brief at 10). Further, the ALJ did not state what weight, if any, was given to Dr. Bradberry's opinion. Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight give to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, * 5.

It was error for the ALJ not to give "controlling weight" to Dr. Bradberry's opinion. In fact, not only was there no persuasive contradictory evidence, there is substantial supportive evidence of Dr. Bradberry's opinion as discussed in the medical evidence above. Dr. Waheed, another treating physician, noted the plaintiff's migraines, seizures, weakness, fatigue, and numbness over several years. MRIs have shown multiple frontal lobe lesions. The plaintiff's own testimony is consistent with Dr. Bradberry's opinion. Further, the report of the consultative examiner to whom the plaintiff was sent also supports Dr. Bradberry's opinion. Dr. Robert E. Brabham, a licensed psychologist, examined the plaintiff on May 3, 2001. At that time her full scale IQ score was 72, which is in the borderline range of intellectual functioning. Dr. Brabham found the plaintiff to be "quite credible" and stated:

> [The plaintiff] is now demonstrating many of the classic symptoms associated with the onset of [multiple sclerosis]. There is beginning to be deterioration of mental skills, and her academic and intellectual capacities may have already been adversely influenced.
>
> Equally important, apparently, is the fatigue and visual problems that she experiences as well as the depression all related to the diagnosis of her MS. Based on all of the evidence available at the time of this evaluation, it appears that she has major limitations now in her ability to perform work related functions due to her obvious deficits in reasoning and limitations that manifest themselves with regard to her not making appropriate occupational and social adjustments due to the combination of conditions.

(Tr. 140-43).

19

Based upon the foregoing, this court finds that the ALJ failed to properly evaluate the opinion of the plaintiff's treating physician and further failed to properly evaluate whether the plaintiff's intermittent incapacity constitutes an inability to perform any substantial gainful activity.

### Listing of Impairments

The plaintiff next alleges that the ALJ erred in failing to find that the plaintiff meets the multiple sclerosis listing. A claimant who has a severe impairment which meets or equals a listing, and who is not currently engaged in substantial gainful activity, is entitled to disability benefits. *Durham v. Apfel*, 34 F.Supp.2d 1371 (N.D.Ga. 1999); *see also Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984)(noting that a claimant's disability is established if his nonexertional condition is a listed impairment in the regulations). The question on appeal is whether there is substantial evidence to support the finding of the ALJ that the plaintiff's impairments did not constitute a listed impairment. If her impairment satisfies the medical conditions set forth in the Listings, the plaintiff is considered to be disabled. This pertinent section of the Listings provides as follows:

> 11.09 *Multiple sclerosis*. With:
> A. Disorganization of motor function as described in 11.04B; or
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved in the multiple sclerosis process.

20 C.F.R. pt 404, subpt. P, app. 1 §11.09.

The ALJ found that the plaintiff did not meet the multiple sclerosis listing, but there is no discussion in the decision of the reasons why the plaintiff did not meet the listing (Tr. 209, 212). In *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), the court stated:

20

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of [the claimant's] symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

*Id.* at 1172. Likewise, in this case, it is impossible to determine whether substantial evidence supports the ALJ's finding since there is no indication of the evidence on which he relied in reaching his decision. Accordingly, the ALJ failed to properly evaluate whether the plaintiff met the multiple sclerosis listing.

### *Pain*

Lastly, the plaintiff contends that the ALJ erred in failing to evaluate her pain pursuant to Fourth Circuit case law. The ALJ stated the following with regard to the plaintiff's credibility: "The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision" (Tr. 212).

A claimant's allegations of pain, disability and limited function itself, or its severity, need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor by factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

The plaintiff testified that she takes weekly injections and walks with a cane. She stated that she has constant pain in her arms, legs, and hands, and numbness on her

left side.  She further testified that she frequently drops things due to the weakness and swelling in her hands, and she has trouble remembering things and staying focused (Tr. 218-24).  In support of his conclusion that the plaintiff was not fully credible, the ALJ stated the following:

> While there has been some disease progression and while the claimant uses a cane, she is able to ambulate and lift and carry 10 pounds.  While she complains of memory and concentration problems, I find no objective testing after Dr. Brabham's report that would support worsening mental capacity . . . .

(Tr. 210).

> Social Security Ruling 96-7p provides:
>
> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, *2 .  The plaintiff suffers from multiple sclerosis, a medical impairment reasonably likely to cause the symptoms claimed.  Further, the symptoms which the plaintiff testified she experiences are reasonably consistent with the medical evidence and the conditions from which she suffers.   Further, as noted by the plaintiff, the defendant's own consultative examiner noted several times in his report that he found the plaintiff to be "quite credible" (Tr. 140-43).  Clearly, the ALJ erred in failing to properly evaluate the plaintiff's subjective complaints.

## CONCLUSION AND RECOMMENDATION

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits.  The plaintiff here has not had a resolution to her claim for over five years, and reopening the record for more evidence would serve no purpose.  *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th

Cir. 1974). Accordingly, this court recommends that the Commissioner's decision be reversed and that the case be remanded to the Commissioner to take appropriate action for the awarding of benefits.

s/William M. Catoe
United States Magistrate Judge

December 5, 2005

Greenville, South Carolina